## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54282-0-II |
| Respondent, | |
| v. | |
| CALVIN CLIFFORD BUHL, JR., | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Calvin C. Buhl, Jr. appeals his robbery in the first degree and assault in the second degree convictions. Buhl contends that he was denied due process when the trial court destroyed the juror questionnaires after trial. He further alleges juror misconduct and that the court erred in allowing the State to call a rebuttal witness. In his statement of additional grounds (SAG) for review, Buhl contends that he was denied effective assistance of counsel. We affirm.

### FACTS

Following an altercation, the State charged Buhl with robbery in the first degree, assault in the second degree, and taking a motor vehicle without permission in the second degree. Prior to trial, the superior court clerk's office sent the attorneys a list of over 200 potential jurors.[1]

I.    VOIR DIRE

During voir dire, the State asked juror 10 what she thought when she received her jury summons. She responded that she "didn't really have any yeah or nay thoughts, I just thought it

---

[1] Our record shows 241 potential jurors on the list, but in other places in our record, defense counsel and the trial court state that there were 230 potential jurors on the list.

might be interesting." Report of Proceedings (RP) (July 23, 2019) at 54. Defense counsel later asked the potential jurors,

> Now, it is anticipated that a lot of testimony is going to come up in this court about drugs, drug dealing, using heroin, rigs, and shooting up.
> Does anybody have a really strong feeling about drugs such that they wouldn't be able to be fair if they hear that someone's using heroin?

RP (July 23, 2019) at 65-66. Three jurors raised their hands; defense counsel asked follow-up questions about whether the potential jurors could be fair and impartial even with their prior experiences. Juror 10 did not raise her hand or provide further comment.

At the end of voir dire, Buhl requested a mistrial, arguing that the process of selecting the jury violated his due process rights. Defense counsel alleged that the list of potential jurors was too large, he was not given the list until the morning of voir dire, the list was unnumbered and unalphabetized, and that 15 people on the list had no information. The trial court denied Buhl's motion for a mistrial, reminding Buhl that the court "gave the parties additional time to review [the juror] questionnaires and the information that was obtained and the voir dire apparently seemed to go well." RP (July 23, 2019) at 87.

Juror 10 was one of the 12 jurors selected for Buhl's case. The jury picked juror 10 as the presiding juror.

II.    TRIAL

During trial, Cory Patnode testified that he was acquainted with Buhl through their mutual drug use. One day, Patnode and Buhl went to Jose Baltazar's house to purchase drugs. Patnode and Buhl sat down and Buhl began talking about money that Buhl owed him. Buhl then stated, "I hate having to do this" and punched Patnode so hard that he blacked out. RP (July 23, 2019) at 112. When Patnode awoke both Buhl and Baltazar were hitting him. Eventually the two took

2

Patnode's vehicle and left. Baltazar pled guilty to robbery in the first degree, assault in the second degree, and taking a motor vehicle without permission for his involvement in the incident.

Baltazar testified for the defense. He testified that he acted alone. He also testified that his girlfriend was in the home on the day of the incident. During cross-examination, Baltazar admitted that he originally stated that he was innocent when first arrested, but after pleading guilty, he alleged he acted alone.

Buhl also testified in his defense that Baltazar acted alone in beating up Patnode and taking his vehicle. Buhl testified that he did not assist Baltazar in anyway.

After the defense rested, the State asked for a recess to permit police to locate and interview Baltazar's girlfriend, Jenna Turner.[2] The State argued that it did not know Turner was in the house until the morning before Baltazar's testimony. The trial court permitted a longer lunch break to contact her and informed defense counsel that he would also be permitted time to interview Turner if needed. After lunch, the court granted the State's request to call Turner as a rebuttal witness. It also granted another short recess because Turner was crying and afraid to testify.

Turner testified that on the day in question, Baltazar had asked her to go upstairs and as she was going upstairs, she heard some yelling, so she went back downstairs. She then saw Baltazar kick Patnode and Buhl punch Patnode. Patnode kept asking them to stop and that he was sorry for stealing from them. Turner was unsure how many times the men punched and kicked Patnode. The State also asked if Turner was clean and sober, and she answered that she had been clean and sober for the last two months.

---

[2] The State also wanted to locate Wyatt McCaulley, another potential rebuttal witness who Baltazar alleged was inside the home. Buhl ended up calling McCaulley as a surrebuttal witness. McCaulley testified he was in the garage and did not have any knowledge of the altercation between the men.

During Turner's testimony, juror 10 informed the bailiff that she had a potential conflict with Turner, but she could not divulge the reason. During a recess, the bailiff notified the trial court. The court then questioned juror 10 about the potential conflict. Juror 10 told the court that she was a drug and alcohol counselor and that she had performed a drug assessment on Turner approximately six weeks prior. The court inquired into juror 10's ability to be fair and impartial and she assured the court that she could. Defense counsel then questioned juror 10 about her employment and interaction with Turner. The court followed up with asking juror 10 if her interaction with Turner would influence her view of Turner's credibility and she said no. Buhl moved for a mistrial, which the court denied, concluding that juror 10's knowledge of Turner would not prevent juror 10 from "fairly and impartially judg[ing] the credibility of the witness." RP (July 24, 2019) at 96.

III.    VERDICT AND POST-CONVICTION MOTIONS

The jury found Buhl guilty of the robbery and assault charges but not guilty of the taking a motor vehicle charge. After the jury reached its verdict, but before sentencing, Buhl requested a new trial based on juror misconduct. The trial court permitted the defense to investigate possible juror misconduct. The court ultimately denied the motion for a new trial. Buhl appealed.

One year after trial and after Buhl filed his notice of appeal, Buhl filed a motion for disclosure of the juror questionnaires. The trial court denied the motion, informing Buhl that the court destroyed the juror questionnaire "as required by statute[3] at the end of the jury term for the jurors in this case." Clerk's Papers at 100.

---

[3] The court did not reference which statute it was referring to.

4

ANALYSIS

I.     PRESERVING RECORD FOR APPELLATE REVIEW

Buhl first contends he was denied due process because the trial court failed to preserve the record sufficient for appellate review by destroying the juror questionnaires. We disagree.

A.     Legal Principles

A criminal defendant must have a "'record of sufficient completeness'" for appellate review of potential errors. *State v. Tilton*, 149 Wn.2d 775, 781, 72 P.3d 735 (2003) (internal quotation marks omitted) (quoting *State v. Thomas*, 70 Wn. App. 296, 298, 852 P.2d 1130 (1993)). A defendant is denied due process when the trial court record is insufficient for appellate review. *Tilton*, 149 Wn.2d at 783. We review alleged due process violations de novo. *State v. Mullen*, 171 Wn.2d 881, 893-94, 259 P.3d 158 (2011).

Under GR 31(a), courts will "facilitate access to court records." However, "[a]ccess to court records is not absolute and shall be consistent with reasonable expectations of personal privacy." *Id*.

B.     Juror Questionnaires

Juror questionnaires are a screening tool used by attorneys during voir dire. *State v. Beskurt*, 176 Wn.2d 441, 447, 293 P.3d 1159 (2013). Relying on *Tilton*, Buhl argues that his right to a sufficient record for appellate review includes juror questionnaires. In *Tilton*, the court tape recorder was accidentally not turned on during part of the trial proceedings. 149 Wn.2d at 779. As a result, none of Tilton's direct testimony, and only a small portion of his cross-examination, was recorded. *Id*. The trial court attempted to reconstruct the record with affidavits, but Tilton's trial attorney had no notes and no independent recollection of Tilton's testimony. *Id.* at 780. And Tilton's appellate counsel had not been present at the trial and so was unable to judge the

completeness of the reconstructed record. *Id*. at 783. Because of this, Tilton was unable to fully argue his ineffective assistance of counsel contention on appeal. *Id*.

The Supreme Court in *Tilton* first noted that "[a] new trial will seldom be required when a report of proceedings is not recorded or is lost," but in Tilton's case, the court held that the record was not of sufficient completeness to permit effective appellate review of whether Tilton was denied effective assistance of counsel. *Id.* at 786. The court then vacated Tilton's conviction and remanded for a new trial. *Id*. at 787.

Similarly, in *State v. Larson*, 62 Wn.2d 64, 381 P.2d 120 (1963), the Supreme Court held that a reconstructed record was insufficient. There, the court reporter's notes from the entire trial were lost and the trial court prepared a narrative statement of facts based on its notes. *Id.* at 65. The Supreme Court held that the reconstructed record was inadequate to permit review of Larson's multiple issues on appeal. *Id*. at 67. The court held that the lack of a sufficient record constituted a denial of due process, and the court reversed the convictions and remanded for a new trial. *Id*.

This case is distinguished from both *Tilton* and *Larson*. Our record includes voir dire and the colloquy between the court, counsel, and juror 10. While we are unable to determine if juror 10 disclosed her occupation on her questionnaire (we presume for purposes of this appeal that she did not) we, nevertheless, have a sufficient record to review Buhl's juror misconduct claim.

Because our record is sufficient to review Buhl's juror misconduct claim, we hold that the trial court's destruction of the questionnaires after trial did not deny Buhl due process.[4]

---

[4] Buhl also cites to RCW 36.23.070 (regarding trial exhibits) and RCW 36.23.065 (regarding destruction and reproduction of court records) but fails to provide meaningful argument regarding these statutes. We note that neither statute references juror questionnaires.

II.   JUROR MISCONDUCT

Buhl next contends he was entitled to a new trial based on juror misconduct because juror 10 failed to speak up during voir dire about her profession and she failed to disclose her prior interaction with Turner. We disagree.

Buhl requested a new trial based on alleged juror misconduct. The trial court denied the motion. We review the denial of motions based on juror misconduct for an abuse of discretion. *State v. Elmore*, 155 Wn.2d 758, 773-74, 123 P.3d 72 (2005). We grant "broad discretion to the trial judge in conducting an investigation of jury problems." *Id*. at 773. The trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *State v. Allen*, 159 Wn.2d 1, 10, 147 P.3d 581 (2006).

To obtain a new trial, the complaining party must demonstrate: (1) a juror failed to honestly answer a material question on voir dire; and (2) a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984).

During voir dire, juror 10 expressed her interest in serving on a jury and that she did not have strong feelings either way. At one point during voir dire, defense counsel asked the jury if any member of the panel had "strong feeling[s] about drugs such that they wouldn't be able to be fair if they hear that someone's using heroin?" RP (July 23, 2019) at 65-66. Juror 10 did not voice any concern with being able to be fair.

After the defense rested, the State called Turner, who had not been on the witness list during voir dire. Juror 10 promptly informed the bailiff that she had a potential conflict with Turner but she could not divulge the reason. There is no way juror 10 could have notified the court any sooner of her potential conflict with Turner.

7

The court questioned juror 10 about the potential conflict. Juror 10 told the court that she was a drug and alcohol counselor and that she had performed a drug assessment on Turner approximately six weeks prior. The court inquired into juror 10's ability to be fair and impartial and she assured the court that she could. Defense counsel also inquired into juror 10's employment and interaction with Turner. The court followed up with asking juror 10 if her interaction with Turner would influence her view of Turner's credibility and she said no.

Juror 10 expressed her ability to be fair, she properly notified the trial court of a potential conflict, and, after being questioned by both the court and defense counsel, juror 10 assured the court that her single interaction with Turner would not influence her ability to fairly assess Turner's credibility. Even assuming juror 10 failed to honestly answer a material question on voir dire, Buhl cannot prove the second prong of the *McDonough* two-part test. Being a drug counselor is not a basis for a cause challenge and when juror 10 was questioned she told the court that she could be fair. Accordingly, we hold that the trial court did not abuse its discretion in denying Buhl's motion for a new trial based on juror misconduct.

III.    REBUTTAL TESTIMONY

Buhl next contends that the trial court abused its discretion by allowing the State to call Turner to testify as a rebuttal witness. We disagree.

We review the trial court's decision to allow rebuttal testimony for abuse of discretion. *State v. Copeland*, 130 Wn.2d 244, 288, 922 P.2d 1304 (1996). As discussed above, the court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Allen*, 159 Wn.2d at 10.

"'Rebuttal evidence is admitted to enable the plaintiff to answer new matter presented by the defense.'" *State v. Swan*, 114 Wn.2d 613, 652, 790 P.2d 610 (1990) (quoting *State v. White*,

8

74 Wn.2d 386, 394-95, 444 P.2d 661 (1968)). Although direct and rebuttal testimony may overlap, rebuttal testimony should not be a reiteration of the State's case in chief. *Swan*, 114 Wn.2d at 652. Thus, rebuttal testimony must answer new matter raised by the defense and should not be needlessly cumulative. *White*, 74 Wn.2d at 394; ER 403.

Here, Patnode testified that both Buhl and Baltazar assaulted him. Baltazar testified that he acted alone. During Baltazar's testimony he mentioned that Turner was in the home on the day of the incident. Baltazar's testimony contradicted Patnode's testimony. The State asked for a recess to locate Turner as a rebuttal witness. The trial court gave both parties time to interview the witness and permitted Buhl to call a surrebuttal witness. Turner testified she observed both Baltazar and Buhl assault Patnode.

Counsel was not aware of Turner's presence inside the home until mid-trial. The State's case in chief was that Buhl and Baltazar committed the offenses together. A possible eyewitness not charged with an offense would bring a new perspective to the events. While Turner's testimony was similar to Patnode's testimony, direct and rebuttal testimony are permitted to somewhat overlap. *Swan*, 114 Wn.2d at 652.

Based on the above, Turner's testimony was in rebuttal, and not a reopening of the State's case in chief. Accordingly, tenable grounds exist for the trial court to allow the rebuttal testimony. The court did not abuse its abuse of discretion in allowing Turner to testify.[5]

IV.     SAG

In his SAG, Buhl argues that he received ineffective assistance of counsel because defense counsel became "deathly ill" during trial. SAG at 1. Buhl also appears to argue that the destruction

---

[5] Buhl also appears to argue that the State failed to use due diligence in locating Turner. But Turner's name was supplied by Baltazar, who was only disclosed to the State one day before trial. Buhl's argument fails.

of the "courts record" was error. SAG at 1. We assume his latter argument relates to the juror questionnaires, which has been sufficiently addressed by appellate counsel and does not warrant further discussion. See RAP 10.10(a); *State v. Thompson*, 169 Wn. App. 436, 492-93, 290 P.3d 996 (2012) (allegations of error that have been adequately addressed by counsel are not proper matters for a SAG).

Turning to Buhl's ineffective assistance of counsel argument, the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). An ineffective assistance of counsel claim is a mixed question of fact and law that we review de novo. *State v. Vazquez*, ___ Wn.2d ___, ___, 494 P.3d 424, 432 (2021). To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense. *Grier*, 171 Wn.2d at 32-33 (citing *Strickland v. Washington*, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))

Here, Buhl does not fully explain his ineffective assistance argument. While reference to the record and citation to authorities is not required in a SAG, the appellant must at least "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). Buhl fails to provide us with more information than an allegation that his defense counsel was "deathly ill." SAG at 1. Without more, we are unable to review Buhl's contention. We also note that if Buhl is relying on information outside our record, his proper recourse is the filing of a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

CONCLUSION

The trial court's destruction of the juror questionnaires after trial did not deny Buhl due process because the record is sufficient for purposes of review. Additionally, Buhl does not show juror misconduct and the trial court did not abuse its discretion in allowing the State to call a rebuttal witness. Lastly, we do not consider Buhl's ineffective assistance of counsel argument in his SAG. Therefore, we affirm Buhl's robbery in the first degree and assault in the second degree convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Worswick, P.J.

_____
Price, J.